Quoc T. Pham, SBN 318057
7950 Foothills Boulevard, #10
Roseville, CA 95747
Ph. 916-218-2972
Email: qtplaw@gmail.com

Attorney for Plaintiff Salah

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

KHLOOD SALAH,

       Plaintiff,

    vs.

CONTRA COSTA COUNTY;

DAVID TWA in his official capacity;

JOAN MILLER, KATHY MARSH, KATHY

GALLAGHER, SUZANNE PORTER,

CONSTANCE BRAVOS, VANESSA

REZOS, TANDREA THYSELL, PEGGY

HENDERSON, JOHN BOYLAN,

BRITTANIE MILS, CHAU NGUYEN

each in both official capacity and individually;

PAMELA GAGLIANI, individually;

Ralph Granich, individually;

AND DOES 1 to 100, inclusive,

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  C18-00470 YGR
Judge:

**FIRST AMENDED COMPLAINT**

42 U.S.C §1983
42 U.S.C §1985
Monell-Related Claims
IIED
Legal Malpractice
Fraud, Misrepresentations and Coercion
Injunctive Relief
42 U.S.C. 12131, et seq.


Jury Trial Demanded

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

Plaintiff Khlood Khalih Salah, represents and alleges as follows:

## PARTIES

1. At all relevant times mentioned in this Complaint, Plaintiff KHLOOD SALAH ("Salah" or "Plaintiff") was a resident of the COUNTY OF CONTRA COSTA, ALAMEDA and MARIN COUNTIES, in the State of California.

2. At all times applicable herein, Defendant CONTRA COSTA COUNTY ("County" or "CCC") is a public entity.

3. At all times applicable herein, the CONTRA COSTA COUNTY DEPARMENT OF CHILDREN AND FAMILY SERVICES ("CCC DCFS")  is a subdivision or entity of the Contra Costa County.

4. Plaintiff Salah is the mother of the minor child Y.G. (the "child") born on July 31, 2014. On January 21, 2016, Contra Costa County commenced an action (Case Number JV1600075, the "dependency case") in the Contra Costa County Juvenile Court (the dependency court) to terminate Plaintiff's parental rights and adopt out the toddler on the basis that Salah had mental health issues and that she left the toddler with an inappropriate caregiver.

5. Y.G. father is Ralph Granich. He did not oppose the terminating of his parental right to avoid child support obligations. Plaintiff sue Granich in his individual capacity for malicious prosecution and abuse of process.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

6. At all times applicable herein, defendants Suzanne Porter, Vanessa Rezos, Tandrea Thysell, Constance Bravos and Chau Nguyen were the social workers employed by CCC DCFS. These were the case workers in the dependency case. Plaintiff believes that these social workers are residents of Contra Costa County and other nearby counties.

7. At all times applicable herein, defendants Peggy Henderson, John Boylan and Brittanie Mills and were the social worker supervisors employed by CCC DCFS. Plaintiff believes that these supervisors are residents of Contra Costa County and other nearby counties.

8. At all times applicable herein, defendants Joan Miller, Kathy Gallagher and Kathy Marsh were directors of CCC DCFS. They supervised the social workers and supervisors in the dependency case and they endorsed the status reports submitted to the dependency court.

9. Plaintiff sues the social workers, supervisors and directors in both individual and official capacities as employees/directors of CCC.

10. Arwin Cotas was a psychology student intern employed by Contra Costa County. She was assigned to perform psychological evaluation of Plaintiff in a series of meetings in September and October of 2016. She worked under the license of county psychologist Stephen Cloutier.

11. Defendant David Twa is the County Administrator. Twa is the person responsible for staffing the CCC Board of Supervisors and Board committee, overseeing implementation of Board

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

directives, planning, monitoring, and overseeing County operations, ensuring Board policies are carried out, supervising appointed Department Heads, preparing the annual budget and administering the County's labor management relations program, including managing the collective bargaining process, grievance investigations, providing training and counseling to managers and employees, as well as problem resolution, according to the information on a CCC web page.

12. Plaintiff therefore is informed and believes and on such basis alleges that TWA, at all relevant times mentioned herein, had the power to promulgate and implement policies governing the conduct of CCC DCFS directors and employees in relation to the CCC DCFS's handling of juvenile dependency matters. Plaintiff believes that Twa is a resident of Contra Costa. Defendant Twa is sued herein in his official capacity as the top administrator of CCC.

13. The social workers, their supervisors, the directors and the CCC chief administrator Twa will be referred to as the CCC Defendants.

14. Defendant Gagliani was Plaintiff's appointed attorney for the dependency case shortly after the detention of the child through the jurisdiction/deposition to the time the County recommended termination of reunification service on 11/26/2016. The dependency court denied Plaintiff's Marsden hearing just before the combined jurisdiction/disposition hearing. Attorney Veronica Panella substituted in for the contested hearings until July 20117. The court reappointed Gagliani back in the case over the Plaintiff objection in another Marsden hearing. Plaintiff believes that Gagliani resides in Contra Costa County.  Plaintiff believes that Gagliani

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

acted in concert and act the behest of the CCC DCFS to deprive Plaintiff of her toddler son and to violate Plaintiff's civil rights.

15. Plaintiff is ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 100, inclusive, and for that reason have sued said Defendants under such fictitious names. Plaintiff reserves the right, and will seek leave of Court to amend this Complaint to identify said Defendants when their identities have been ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants was - and is - in some manner liable and legally responsible, in that their conduct caused the damages and injuries set forth herein.

17. Plaintiff is informed and believes and thereon alleges that each of the above named CCC defendants was acting under color of law in committing the acts herein alleged, and that in doing the things alleged, Defendants, and each of them, were acting within the course and scope of their duties as employees or agents of CCC, or were otherwise acting in voluntary collaboration with each other in their conduct as alleged herein below.

19. Plaintiff is informed and believes and on such basis alleges that at all relevant times, the CCC Defendants, and each of them, were the knowing agents and/or alter egos of one another, and that Defendants directed, ratified, and/or approved the conduct of each of the other Defendants, and each of their agents or employees, and are therefore liable for the acts and omissions of their co-defendants, their agents and employees as more fully alleged herein. Moreover, all of the

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

Defendants agreed upon, approved, ratified, and/or conspired to commit all of the acts and/or omissions alleged in this Complaint.

20. Plaintiff  is a qualified individual with a disability as provided in the Americans with Disabilities Act of 1990, 42 U.S.C. §12102 ("Americans with Disabilities Act"), Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act"), California Civil Code, §51, et seq. ("Unruh Civil Rights Act"), §52, et seq., California Government Code§§ 12926, et se., 12926.1, et seq., and other statutory measures which refer to the protection of the rights of "physically disabled persons."

21. Plaintiff  is a disabled individual who has had a history of or has been classified as having a mental health disability, as required by 42 U.S.C. §12102(2)(A), Section 504 of the Rehabilitation Act, California Government Code§§ 12926, 12926.1, and related statutes, laws, regulations and ordinances defining a disabled person.

22. Plaintiff is informed and believes and thereon alleges that the CCC Defendants, and each of them, at all times relevant to this action, were recipients of funding and/or financial assistance from the United States of America and the State of California within the meaning of various statutes written for the benefit of disabled persons, including, but not limited to, the United States Code , the Code of Federal Regulations, the California Health and Safety Code, the California Civil Code, the California Government Code, and the regulations promulgated for each such code.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

23. Plaintiff is further informed and believes, and thereon alleges, that the CCC Defendants, have written reporting requirements pursuant to said agreement and/or agreements with the United States of America, the State of California, and/or their authorized agents, whereby Defendants, and each of them, agree to comply with various statutes written for the benefit of disabled persons, including, but not limited to the Code of Federal Regulations, the Rehabilitation Act, the California Civil Code, and the California Government Code.

24. Plaintiff is informed and believes and thereon alleges that the Defendants, and each of them except for Granich, at all times relevant to this action, were recipients of funding and/or financial assistance from the United States of America under the Title IV-E of the Social Security Act.

**JURISDICTION**

25. This case belongs in federal court under federal question jurisdiction because it involves the Constitution of the United States (namely the 4th, 5th, 6th and 14th Amendments), federal laws such as 42 U.S.C. §1983, 42 U.S.C. §1985 and supplemental jurisdiction over the state common law causes of actions under 28 U.S.C §1367.

**VENUE**

26. Venue is proper in the Northern District of California because a substantial part of the events in this action happened in this district and at least one defendant is located in this district and any other defendants are located in California.

**INTRADISTRICT ASSIGNMENT**

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

27. Because this lawsuit arose in Contra Costa County, it should be assigned to the San Francisco or Oakland division. The case has been assigned to the Oakland division.

**COMMON ALLEGATIONS**

28. It is well known that our dependency justice system has suffered numerous failures. Just a few years ago, the legislature had to intervene to control the rampant use of psychotropic medications on foster children.  Recently, the Ninth Circuit Justices were astounded at the length at which the State California went to defend two Orange County CPS social workers who committed perjury so they could take away two children from a mother. (A recording of the hearing for the Right to Lie Hardwick v. Vreeken can be viewed on YouTube at https://www.youtube.com/watch?v=D0-M5hsyLjQ.

29. Now and then, we hear on the news of stories of gross violation of civil rights. CPS social workers took away children without any good reasons or sent children to the arms of child molester foster or adoptive parents. We hear of counties having to pay millions for damages for their lies and wrongdoings but somehow thereafter the social worker defendants remain on the public payrolls or sometimes were even promoted.

30. Plaintiff Salah is one of many victims of the CPS system in Contra Costa County.

31. Salah is a 38 years old American-born citizen of Middle-Eastern ethnic background. She is a visible minority in appearance, manners, mode of thinking and speech.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

32. At the age of twelve, her father moved the family back to Jordan. At the age of fifteen, Plaintiff was forced into a child marriage to a cousin. She attempted to run away but was unsuccessful. Plaintiff returned to New York State in 1997 with her then husband. Two children resulted from this forced marriage. Plaintiff filed for divorce and was able to obtain full custody of the two children.

33. In 2001, Plaintiff moved to California in to be close to family. In 2006, as a single mother of two young children, she still managed to graduate from Cal State Fresno with a Bachelor's degree in health science and women's studies.

34. Around 2010, she fell on a hard time after losing her job. She used alcohol to escape conflict with her conservative Muslim family members who wanted her to return to the cousin ex-husband. One sister who has psychological issues made repeated calls to CPS resulting in numerous unfounded CPS interactions.

35. In 2010, with a then recent job loss and other personal issues, Plaintiff decided not to fight Alameda CPS by giving up custody of the children to their father. She thought at that time that he was in a better financial position to take care of their children.

36. Since then she has maintained contact with the two children. The children will say that she was a wonderful and loving mother who fell on hard times.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

37. After the switch of custody, Plaintiff sought to redeem herself by attending AA and taking training in holistic health. She was completely off alcohol and marijuana. She also obtained a certification and license to practice massage therapy.

36. In August 2013, she met Ralph Granich, then a 58-year-old photographer. Granich moved into her apartment. They got married in 2014. YG was born on July 30, 2014. During the third trimester, Plaintiff discovered that Granich took up a cocaine habit and resumed drug dealing.

37. When Plaintiff asked him to stop for the future of the baby, Granich became abusive because he did not want to lose out on a good source of money.

38. Plaintiff left Granich and moved with a toddler into a new place in Moraga, renting a Section 8 subsidized home from an elderly couple, the Beheshtis. Plaintiff did not know that it was a start of Kafkaesque series of events when the vengeful landlord, his wife, and their daughter used CPS, the police and the justice system as vehicles for eviction.

**The Detention of Toddler Y.G.**

39. The dependency case was initiated by CCC DCFS social worker Suzanne Porter who has a history of domestic violence and setting up people. Failing in gaining advantages in her custody case and punished by the court for acts of domestic violence, she joined Contra Costa Department of Children and Families Services to prey on other victims of domestic violence.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

40. Porter received patently false information from the Fatima Beheshti, the dentist daughter of the landlord couple. Plaintiff became a patient of the daughter. Fatima made sexual advances and was rebuffed by Plaintiff.

41. Plaintiff had a lease under Section 8. An inspector found a problem with zoning code compliance. The landlord did not want to modify the home to comply with the code. He wanted Plaintiff to move out, but he also wanted to keep the $7,000 deposit.

42. Plaintiff moved to this Moraga home to keep away from Ralph Granich, YG's father when she found out that Granich admitted that he used to be a drug pusher and that Granich had relapsed into his cocaine habit.

43. Granich committed acts of domestic violence and threats against Salah. He threatened to harm the child. Granich did not want to take responsibilities for the child.

44. The vengeful daughter, a mandatory reporter, knew how use CPS to retaliate against Salah and to help her parents with the eviction. She called CCC DCFS and alleged that her parents said saw YG, then 16-month-old child allowed by Salah to roam the street "unsupervised."

45. Defendant Porter went to Salah's home to investigate. When asked by Porter, the parents denied having seen the toddler Y.G.  ever being left to roam the street. They told her that Plaintiff "is a good mother" and "takes good care of the baby." After looking at the staircase

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

from the residence to the street, Porter was skeptical of the claim. The child was happy being well taken care of by Plaintiff with the help of a nanny, Maxine Arton.

46. The landlord made a false report to the police that Mother had a mental breakdown. Then they cut off the heat in the middle of a freezing cold night in December. When he did not answer the phone, Plaintiff knocked on his door. He then called the police and exaggerated the incident into that of Plaintiff went out of control, banging on his door and making threats against him and his wife.

47. The landlord then hired a lawyer to get a restraining order against Plaintiff for "elderly abuse." Plaintiff lost the case because her counsel did not show. The landlords knew how to use a restraining order for eviction. Plaintiff was not served with the restraining order. She thought that she only had to stay away from the landlord and his wife. She did not know that the court ordered her to move out of her home. She was arrested one night while sleeping in her own bed.

48. The arrest and the restraining order forced Plaintiff to move out of her own home without her personal properties. On December 30, 2016, the nanny returned to the home, alone, without YG, to retrieve some properties for Plaintiff.  Even though the lease was still valid and Arton's name is on the lease, the Beheshtis called the Moraga police claiming that Arton was trespassing and that Plaintiff had come back, violating the restraining order.

49. Arton told the police that she was on the lease and Plaintiff was not there. The police used excessive force to arrest Arton and entered the home. They did not find Plaintiff there but they

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

also saw Arton's name on a copy of the lease as she told them before. To cover up for the illegal entry and false arrest of Arton, the police claimed that they found methamphetamine on her. However, they did not proceed to charge Arton with drug possession.

50. The DCF and the county counsels zealously found and used any police reports against Plaintiff, but they failed to find out and notice the courts that there were no charges. See also Plaintiff's Declaration on Misrepresentations By Contra Costa County Social Workers and Counsels, Arrest of Maxine Arton on December 30, 2015.

51. After the eviction, Porter advised Plaintiff to leave YG with Maxine, the nanny so that she could go search for housing. Plaintiff had to travel to an out of state HUD office to get her Section 8 housing issue straightened out at an out of state.

52. Porter looked up and found Plaintiff's 2010 CPS case in Alameda. She used this old case and Arton's arrest as reasons to initiate a dependency case against Plaintiff.  She demanded that Plaintiff show up at the courthouse so she could check on the welfare of the child when it fact it was a surprise detention hearing.

**The Detention Hearing**

53. At the hearing 01/21/2016, relying upon false evidence and allegations in the detention report,  the dependency court detained the child with the finding that

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

*12.a      Services that would prevent the need for further detention are not available.*

*12.c(1) There is a substantial danger of the physical health of the child or the child is suffering severe emotional damage, and there is no reasonable means by which the child's physical or emotional health may be protected without removing the child from the physical custody of the parent or legal guardian*

*12.c(2) There is substantial evidence that a parent, legal guardian, or custodian of the child is likely to flee the jurisdiction of the court.*

*12.i      Reasonable efforts were made to prevent or eliminate the need for removal from the home.*

54. There was no evidence to support 12a, and 12(i). The county could have helped but did not help Plaintiff with the housing situation. For 12.c(1), the dependency court could have issued a restraining order for Maxine Arton to keep away from YG. For 12.c(2), even though Porter represented that there was a danger that Plaintiff could flee the jurisdiction, she knew that Plaintiff was out of state to deal with her Section 8 housing at a HUD office. Plaintiff did not flee the jurisdiction: she showed up at the detention hearing. In addition, Plaintiff could not flee the U.S. with the child because their passports were still in a safe in her Moraga home where she did not have access because of the restraining order.

55. For reasonable efforts to prevent the need for removal, the County listed in the Detention Report that they offered "Investigated Referral," "Conferred with Moraga Police Department". By all reasonable interpretation in the English language, these were efforts to substantiate the removal, not for "to prevent or eliminate" the need for removal.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

**The Combined Jurisdictional/Disposition Hearing**

56. On 02/16/16, the dependency court held the jurisdictional hearing and continued the hearing to 03/07/2016. On 03/07/2016, about a month later, counsel Gagliani was not ready to proceed because she needed to subpoena Plaintiff's psychiatrist as a witness. The dependency court continued the hearing to 03/21/2016. On 03/16/2016, Gagliani again asked for a continuance with the excuse that she could not contact the psychiatrist witness and a medical doctor witness. The court continued the hearing to 3/30/16. On 3/30/16, Gagliani again asked for a continuance. The court continued the jurisdictional hearing to 04/13/2016.

57. In dependency cases where a dependent child is younger than three, the parent only has six months to complete the service. Continuance of the jurisdictional hearing is generally considered detrimental and injurious to the cause of the client. Here the continuances shortened Plaintiff's time by almost three months. Plaintiff's time to complete the reunification service was shortened significantly because of the continuations.

58. For an overview of the dependency process, please refer to Attachment 1 to this Complaint which shows a flowchart taken from the Advokids.org website (https://www.advokids.org/legal-tools/juvenile-court-process/).

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

**The First Marsden Hearing**

59. On 04/13/2016, the depending court finally held the jurisdictional hearing. Plaintiff wanted to have a different appointed counsel. Alternatively she wanted to represent herself. A The court held a Marsden hearing.

60. The dependency court started out with its position: "So I want to make -- I want to understand, first off, what your complaint is about Ms. Gagliani because she is one of the best attorneys that - - that is - - that appears in my courtroom.".

61. Plaintiff testified that Gagliani insisted on a plea of no-contest without considerations and evaluations of the facts of the case and failed to communicate with Plaintiff on disputing the allegations by the County:

62. Plaintiff was greatly concerned about her son who was in foster custody: "My child has a bit mark on his arm," "he's not talking anymore. He's withdrawn".

63. Previously, in a supervised visit Plaintiff discovered the bite marks on Y.G. who wore the same clothing for the last three weeks in a row, had long hair and uncut nails and covered with sore.

64. Her appointed attorney Gagliani failed to communicate these issues and concerns to the County.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

65. Plaintiff believed that the County wanted to cover up their negligence by asking the dependency court to restrict photography and videotaping at the supervised visitations. Plaintiff also believed that the County also retaliated against her by making other false allegations related to this complaint against her, e.g., that she made threats against the foster parents, etc.

66. Plaintiff, greatly concerned about Y.G.'s neglect under the foster care and Y.G.'s symptoms of separation trauma, wanted a family maintenance plan where the county could come in to inspect anytime. Plaintiff testified that Gagliani was not helpful in requesting a home maintenance plan. "And I've asked my attorney if she would communicate with CFS for a family maintenance plan, and she said they won't give it to me. She said they won't even make an offer."

69. Gagliani testified that she "consulted at length with her [Plaintiff's] therapist and that he agreed that getting services was in her best interest and it was not in her best interest to go forward with the trial."

70. It seemed that Gagliani took advice for a legal course of action/non-action from a psychiatrist, instead of exercising her expertise and judgments. It seemed that she was looking for an excuse to shortcut to a no-contest plea.

71. It also seemed that Gagliani also based her legal decision on the allegations by the Department without any further independent investigation. She testified " I firmly believe, given all of the contact notes that I've read and all of the information that I have read put out by the

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

Department, that it would probably be more harmful than good for her to go forward with the trial."

72. Gagliani testified "she and I have spent more than ten minutes on the telephone. We've spent lots of time on the telephone. We've spent time here in court talking." Gagliani did not tell of the actually amount of time she spent discussing the case with Plaintiff.

73. Gagliani did not mention interviewing any other witnesses such as the landlord, his wife, their daughter, the nanny Maxine Arton, the Moraga police officers, relatives on both sides, the previous attorney Alex Verbeck, etc. Gagliani did not question the veracity of the investigator social worker Susan Porter.

74. A search on the Internet or court dockets would have revealed a restraining order on Porter (e.g. Superior Court of Contra Costa County, Case No D06-04997, May 31, 2012), her husband's civil suit against her  DUI set up scheme and the civil lawsuit (Former Contra Costa sheriff's deputy, victims, decoy testify in "Dirty DUI" trial, The East Bay Times, August 20, 2013, https://www.eastbaytimes.com/2013/08/20/former-contra-costa-sheriffs-deputy-victims-decoy-testify-in-dirty-dui-trial/]. These would have brought the credibility of the county witness Susan Porter and the county case itself.

75. The dependency court told Plaintiff: "Because one of the reasons she's saying is, after a trial, the -- the court may well not award services to you, and that's what she's worried about. So if she gets an agreement ahead of time that you're going to get services, then, in her opinion, that's what

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

she things is best for you.", "But if you understand that that's the downside, then, you know, it's really going to be on you if that's what happened. Do you understand that?", "if you have an agreement, then you wouldn't be waiving your right to services; you would be getting the services." "But that's the risk you take. Because they may well say, well, Judge, we don't agree, and then it makes it harder for Ms. Gagliani or you to -- to persuade me, you know. It could mean, I don't know. I haven't prejudged the case."

76. The dependency court appeared to tell Plaintiff that the County has a power of persuasion on the court to bypass service. The dependency court said that he had not prejudged the case, but the appearance of impartiality was gone, he had pre-judged on the bypass issue: there was no previous failure of reunification, reunification service is mandatory in this case.

77. Gagliani also brought up the possibility of imposing a guardian at litem on Plaintiff.

78. The appointment of a GAL itself is devastating to the case because the parent is mentally unfit and by implication unfit to be a parent. The dependency court also appeared to assist with this threat by denying the Marsden motion and commenting on the possibility of a guardian ad litem: "... the next question is the issue of the appointment of a guardian ad litem for you."

79. Upon information and belief, before the Marsden hearing, counsel for CCC and the appointed counsel for the child, Sal Lombardo also mentioned GAL.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

80. Because Plaintiff did not know about the due process required for a GAL appointment, she thought that it was imminent. Plaintiff's free will was overborne. She gave up her chance to contest the false allegations and the jurisdiction of the dependency court. Plaintiff was afraid that with the bypass she would not see her son again.

81. The court unduly influenced Plaintiff to give up her rights by talking only about being bypassed as the downside but not the burden of proof by the county or the disadvantages of having the false allegations used against her later on. Plaintiff also did not receive this information from Gagliani.

82. The court and Gagliani unduly influenced Plaintiff to give up her rights by talking only about being bypassed as the downside but not the burden of proof by the county or the disadvantages of having the false allegations used against her later on.

83. When the jurisdiction hearing resumed in the afternoon session, she agreed to a no contest plea. This plea forced her into a system she should not have been in the first place. This system was designed to manufacture false evidence to be used in court to terminate parental rights. Parents who entered the system seldom ever get their children back.

**Contra Costa County Department of Children and Families Services Bureau (DCF, the County)**

84. The county did not disclose a mitigation fact to the dependency court and the Court of

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

Appeals - that DCF is a severely dysfunctional organization. The county has known about this problem for years yet has not come up with any effective working solution.

85. In 2015, Contra Costa County published a performance report for the county agencies. In Section IV.C, on the Children and Families Services Bureau, the report lists several deficiencies:

> During the past year, Children & Family Services has experienced substantial instability, with significant attrition in upper level management and supervisory positions and two reorganizations. The new CFS management team has a radically new composition including a new interim Director, four of seven new managers, the loss of several manager consultant positions (retirees) and several Program Analysts vacancies. This has created some instability throughout the bureau.
>
> ...
>
> CFS continued to be challenged by high vacancies and turnover in social worker positions. Reasons for this include the difficultly of the job, high caseloads, low morale, higher compensation at nearby counties, and a slow hiring process. We lost nearly 50% of social worker positions during the recession.
>
> ...
>
> Our success in hiring new caseworkers presents its own challenge. CFS finds itself with over a third of positions held by new, inexperienced social caseworkers and supervisors (and managers), in a business that demands a high level of knowledge, skill, expertise, and critical thinking.
>
> ...
>
> In 2014, CFS opened about 800 formal cases for families which involve a tremendous amount of work, including multiple Juvenile Court hearings, in-depth interviews and background investigations, the removal of children from their homes, family crisis management, team and family group meetings and case plan development.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

Last year, in addition to the 800 new families mentioned above, there were already 1,800 families involved with CFS. These 2,600 cases yielded a substantial workload -- 13,000 in-person face-to-face contacts with 20,000 people and 5,500 Juvenile Court hearings.

86. On September 2106 while the case was still on, Contra Costa County workers went on strike for the lack of county leadership, being underpaid and overworked because of staffing and hiring problems.

87. The staffing, training and retention problem manifested themselves in this case. Four social workers came in and out of the case. The investigative social worker, Suzanne Porter, was hired without a proper background check. The county let her loose to create havoc with people's lives including interference in a family court case to deprive a mother of her custody of her child.

88. As usual, under the self-serving excuse of confidentiality, the county has not been transparent about any measure they have taken to investigate, rectify and remedy past wrongdoings. Many parents, including the Plaintiff, did not have much success in their request for DCF to review cases handled by Porter.

89. DCF set loose in the community social workers some with psychological issues, most overworked and without sufficient training or experience to deal with parents.

90. Instead of helping parents addressing their problems to facilitate reunification with their children, the county insisted on allegations of mental health issues to terminate parental rights

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

when there is no nexus between the mental health issues and any neglect or danger to the children.

91. Services are perfunctorily for a semblance of due process and as a fishing expedition for evidence to be used against parents.

92. In 2016 to 2017, CCC DCFS suffered a strike and a mass exodus of social workers who were underpaid and overburdened with case loads.

93. The work crunch had lead to social workers not having time to read a massive number of cases leading to mistakes such as violations of court orders.

94. Some workers, such as Chau Nguyen, not having familiarity with the case, made up facts in status reports submitted to the court.

95. Some workers such as Defendant Thysell, lacks patience and social skills to deal with traumatized parents. When pressed to provide services which were delayed, Defendant Thysell got ticked off and retaliated against Plaintiff by writing bad status reviews.

**The Social Workers**

96. Social worker Suzanne Porter conducted the initial investigation on and about November 2015. On January 20, 2016, she filed a petition requesting detention of the child. She was never

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

called as a witness at any hearing or trial and disappeared from the case after February 2016. She reported to supervisor Peggy Henderson.

97. The county failed to conduct a proper background check for Porter. Porter has a record of domestic violence assault and battery against her ex-husband.  Porter hired a private detective and a county sheriff deputy to entrap her husband in a DUI scheme to gain litigation advantage in a child custody case.

98. According to a newspaper article, in a domestic violence restraining order case, a judge ruled that Porter pushed her way into her ex-husband's home and hit him in the head with a shoe. In another altercation, she injured his face and shoulder.

99. It was not clear whether Porter resigned or was fired or moved to a different position in 2017.

100. Kathy Gallagher, director of Contra Costa Employment and Human Services Department who has been a director at the Contra Costa Department of Children and Families, when asked about Porter, stated that "We don't consider it relevant what's going on in their personal lives."

101. Upon information and belief, the County did not care because they need pathological liars and tricksters among their staff to made up false allegations to detain children and to terminate parental rights.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

102. The County's main objective is to earn federal incentive Title IV-E money by putting children in foster home or for thousands of dollars for placing them up adoptions.

103. In particular, the Contra Costa Legal Department knew or should have known about Porter's sociopathic conducts and her credibility when they brought forth the detention petition against Plaintiff in early 2016.  Contra Costa County had to pay the ex-husband Aksu $260,000 in late 2015 to settle a federal civil suit, Hasan Arda Aksu v. County of Contra Costa et al., Northern District of California Case No. C 12-04268 CRB. See also an online newspaper article at https://www.eastbaytimes.com/wp-content/uploads/2017/03/092615-settlement-agreement-with-county.pdf.

104. Not only the attorneys for Contra Costa failed to examine closely the petition drafted up by Porter they also failed to disclose any disturbing facts on Porter's background.

105. After the failure of the DUI entrapment scheme against her husband, apparently, Porter joined Contra Costa DCF where she found plenty of opportunities to manipulate custody cases and deprive other mothers custody of their children.

106. Yekaterina Ramirez was another victim of Suzanne Porter. She lost custody of her child after Porter alleged that Ramirez made false allegations of child abuse against the child's father. Ramirez later found out about Porter's record and termination. Even after CCC DCFS received another report of abuse of the child from an independent mandatory reporter, the County refused

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

to do anything. When Ramirez approached Contra Costa to revisit the case, she met with evasion and cover-up.

107. Social worker Tandrea Thysell substituted in as the case worker from April 2016 to May 2017.  It appeared that she went on a leave of absence from November 2017 to March 2017. Her supervisor Constance Bravos was supposed to cover for Thysell during this period but never held any monthly meeting with Plaintiff during Thysell's absence.

108. Thysell was employed by DCF from April 2015 to October 2017, for about two years and seven months. Before that, she was a clerk, a substitute teacher and an attendance clerk with a B.Sc. degree in Journalism and an associate degree in Liberal Arts. In 2014 she obtained an M.Sc. degree in Counseling, Marriage and Family Therapy and Counseling in a two-year program with the University of Phoenix. She barely had about one year of experience with dependency cases before taking up the case. She was no longer with DCF as of October 2017.

109. Plaintiff requested the County to assign to her case a social worker who knows communication styles of Arabic people and was laughed at. Plaintiff told them that there was a communication barrier because of Thysell's constant misinterpretation of Plaintiff's communication style.  Indeed, Thysell's status reports turned out to the court contain personal hostilities, misrepresentations and misinterpretations.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

110. Social worker Thysell wanted Plaintiff to attend a parenting class in Antioch late at night in an unsafe location not accessible to Plaintiff because of her lack of transportation. Plaintiff testified that she had to find on her own and completed an alternative court accredited program.

112. Social worker Chau Nguyen substituted in from April 2017 until now. She only knew of the case through hearsays in the reports.

113. Nguyen made false allegations to the dependency court that Plaintiff had a history of assault with a deadly weapon, a hit and run, etc.

114. In May 2016, someone slipped drug into Plaintiff's drink causing confusion and disorientation. Even though Nguyen did not have the full story, she still reported the even as "an incarceration".

115. Plaintiff was able to meet with Rezos in 2/16/16, with Rezos and Thysell on 04/07/2016, with Thysell on 06/07/16 (the only home visit), on 10/20/16 with Thysell and her supervisor Brittanie Mills (her attorney failed to show), once in April 2017 with Thysell, the county counsel with her attorney Panella. The county failed to provide the required monthly meetings in March, May, July, August, September, November and December of 2016, January, February, March and May of 2017.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

116. While Thysell was out on a leave of absence, the county failed to provide a replacement and did not inform Plaintiff until she made inquiries to find out what happened to the monthly meetings. Thysell's supervisor, Brittanie Mills was also out on a leave of absence.

117. Out of 59 scheduled visitations, Plaintiff missed about three. Instead of acknowledging that Plaintiff had made a substantial number of visitation, the social workers created artificial "incidents" and grossly exaggerated that the child was in danger in Plaintiff care during visitation.

118. For example, taking clues from the detention report on Y.G. was left alone roaming the street, they claimed that Plaintiff let the child running lose and in danger of running into traffic, a deadly pond and a dangerous elevator doors.

119. This was impossible because when the County sent Y.G. to be examined by a doctor who reported that the toddler could walk but he could not run and could not walk up or down the stairs.

**Psychological Evaluation by County Student Intern Arwin Cotas**

120. Business and Professions Code section 2914, requires the possession of a doctorate degree in psychology to practice psychology in California.

121. Contra Costa did not provide a licensed psychologist to perform the evaluation of Plaintiff.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

 They assigned Arwin Cotas, a student intern with a master's degree to evaluate her under the license of Dr. Steven Cloutier who signed the psychological report but he never met Plaintiff.

122. Plaintiff was evaluated on September 22, October 5 and 12 of 2016, more than ten months after the detention. It is clear that the only intention of the county was to find evidence of mental defects for parental termination, not to evaluate Plaintiff for treatment.

123. Cotas reported that by Plaintiff's psychiatrist, Dr. Levine told her that Plaintiff was taking 30 mg of Adderall (amphetamines) and 20 mg of Prozac. Those two prescriptions along should have alerted Cotas to connect them to Plaintiff's unusual demeanor, short temper and other interpersonal issues.

124. Dr. Levine misrepresented to Cotas the prescriptions he gave Plaintiff. He prescribed a double dosage of amphetamines (totaling up to the maximum 60 mg a day) together with other psychotropic medications such as Clonazepam, Zolpidem, Lorazepam and Fluoxetine.

125. Any competent psychologists would be alarmed at such dosages and combinations of psychotropic over-medications.

126. Cotas noted that Plaintiff suffers from mood swing, that her mood was "labile and fluctuated between anger, sadness, and contentment, although it appeared to match her thought content and she display a broad range of affect", that Plaintiff had a "difficult time regulating her emotions".

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

127. Cotas also noted that "Despite Ms. Salah's difficult history and situation, she displays strength in her resilience, her perseverance, and she has many employable skills and special interests."

128. On May 23, 2016, Levine told to CCC DCFS on May 23, 2016 that he did not believe that Ms. Salah had a "psychiatric illness," and was, instead, "eccentric and idiosyncratic,".

129. On September 21, 2016 Levine told CCC DCFS that Ms. Salah likely had a diagnosis of "histrionic borderline personality disorder." He also described her to be "entitled, narcissistic, and flamboyant," adding that he "had never seen anything like her in 30 years of practice" and that she "has a stunningly difficult time doing things in a normal, responsible fashion." Plaintiff also saw her therapist, Dr. Kevin Pinjuv who worked under Dr. Levine's lience. Dr. Pinjuv's diagnostic impressions of Ms. Salah are "PTSD, Anxiety, Depression, ADHD, with Borderline tendencies." He reported that he often has a hard time receiving a clear narrative from Ms. Salah and would like any additional insight. He also believes that while Ms. Salah "loves her child," her difficulty regulating her emotions and keeping boundaries are problematic.

130. Upon information and belief Levine did not tell Pinjuv of the psychotropic medication prescriptions.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

**The County Contends That Plaintiff Is Not a Fit Parent Because of Her Incurable Personality Disorders**

131. At the conclusion of the trial, county counsel Noel Plummer closed with this statement:

> *That Code Section, 366.21(g)(1), does not require the Court to find that she's completed the case plan or for the Court to find that she's done a lot of work on her case plan, or for the Court to find that she's done her very best, all of which are arguable, but that she's made significant progress addressing the issues that led to Yusef's removal, which were her essentially mental health issues.... These conclusions are clearly contrary to Mother's other treatment providers, Dr. Pinjuv, who testified that he had seen mother in person approximately 50 times since March of 2016. He was very sympathetic to Mother. But he did say that she had severe interpersonal difficulties, and that her mood swings between anger, sadness and euphoria. He diagnosed her with borderline personality disorder.*

> *Dr. Pinjuv said the treatment process for this disorder usually takes multiple years; and that he had had -- longest he'd ever had a client stay in treatment was one year, and that client did not complete the treatment.*
> *He said that Ms. Salah recognized there's something off with regard to her frequent interpersonal altercations, but that she has made very little progress on her therapeutic goals.*

> *We heard from Brittanie Mills, Ms. Thysell's supervisor, who said that Ms. Salah is largely compliant with her plans, but was unable to demonstrate behavioral changes.*

132. The County's case for termination of parental right is based on Plaintiff's personality disorders which the County contended to be incurable and also Maxine Arton's arrest, various interactions with the police, restraining orders on Plaintiff, etc.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

133. However the County failed to do diligent fact checking and follow up to see if the charges were dropped.

134. For example, the criminal court of Alameda dismissed the charges against Plaintiff when Ralph Granich took the Fifth to avoid a perjury charge for false statements made on his application for the restraining order and other possible criminal charges.

135. The county was diligent in checking for things that they could use against her but somehow they did not apply the same skill to look for things that exculpate her such as court records.

**The Root Cause of Plaintiff's Issues Was The Psychotropic Medication, Not Any Mental Health Disorder**

136. Throughout the dependency case, there have been various allegations of various diagnoses of mental disorders such as bi-polar, ADHD, PTSD, histrionic personality disorder, borderline disorder. The county attorneys insisted on eliciting from Plaintiff's psychologist and Ms. Cotas that Plaintiff's personality would be impossible to be cured.

137. Dr. Levine, Plaintiff's psychiatrist, according to the county, claimed that he has never seen a case like Plaintiff. For a psychiatrist to claim not have seen any case of histrionic or borderline personality disorder should have raised a red flag. It turns out that Levine was not truthful to DCF about the extent of psychotropic medications he prescribed to Plaintiff. Levine mentioned only Adderall (amphetamines) and Prozac, but he prescribed a whole lot more.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

139. After a series of expose of the rampant abuse of psychotropic medication of children in foster care, the California Senate passed Bill No. 238, an act to amend Sections 1522.41 and 1529.2 of the Health and Safety Code, and to amend Sections 369.5, 739.5, and 16501.3 of, and to add Section 16501.4 to the Welfare and Institutions Code. One of the requirement is Section 16501.4 Subsection (d):

> In consultation with the State Department of Health Care Services, the Judicial Council, the County Welfare Directors Association of California, the County Behavioral Health Directors Association of California, the Chief Probation Officers of California, and stakeholders, the State Department of Social Services *shall develop training that may be provided to county child welfare social workers*, probation officers, courts hearing cases pursuant to Section 300, 601, or 602, *children's attorneys*, children's caregivers, court-appointed special advocates, and other relevant staff who work with children under the jurisdiction of the juvenile court that addresses *the authorization, uses, risks, benefits, assistance with self-administration, oversight, and monitoring of psychotropic medications, trauma, and substance use disorder and mental health treatments*, including how to access those treatments. [Underline for emphasis added].

140. The social workers, the student psychology intern, the county attorneys, the child attorney Sal Lombardo, Plaintiff's attorney Gagliani, the psychologist Dr. Pinjub all knew that Plaintiff was taking prescribed amphetamines.

141. The following is a list of the psychotropic medication cocktail prescribed by the psychiatrist and descriptions of their effects.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

- Amphetamine and Dextroamphetamine: According to information on Medline Plus https://medlineplus.gov/druginfo/meds/a601234.html) and

  https://www.drugs.com/dosage/amphetamine-dextroamphetamine.html

the usual dose is **5 to 60 mg per day** in divided doses. The symptoms **include "difficulty falling asleep or staying asleep, irritability, hyperactivity, and unusual changes in your personality or behavior", "aggressive behavior", "confusion",** etc. Plaintiff was prescribed the maximum daily dose of 30mg of fast release Amphetamine/dextro-amphetamine and 30 mg of Amphetamine extended release.

- Clonazepam: According to https://medlineplus.gov/druginfo/meds/a682279.html, "you should know that your mental health may change in unexpected ways, and you may become suicidal... while you are taking clonazepam for the treatment of epilepsy, mental illness, or other conditions."

- Fluoxetine (Prozac): According to https://medlineplus.gov/druginfo/meds/a689006.html Fluoxetine is a selective serotonin reuptake inhibitor (SSRI) antidepressant.  Fluoxetine affects chemicals in the brain that may be unbalanced in people with depression, panic, anxiety, or obsessive-compulsive symptoms. According drugs.com at https://www.drugs.com/pro/fluoxetine.html, the maximum dose should not exceed 80 mg a day. The following symptoms: anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor restlessness), hypomania, and mania, have been reported in adult and pediatric patients being treated with antidepressants for MDD as well as for other indications, both psychiatric and nonpsychiatric.

Levine prescribed for Plaintiff 240 pills of 20 mg of Prozac from 09/19/16 to 10/26/16 (**4 pills or 120 mg a day**) and then 60 pills of 20 mg every month (40 mg).

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

- Levetireacetam: According to https://medlineplus.gov/druginfo/meds/a699059.html, this medication can cause seizure in adult, a decrease abnormal excitement in the brain and "your mental health may change in unexpected ways."

- Lorazepam: According to https://medlineplus.gov/druginfo/meds/a682053.html, this medication is taken to relieve anxiety.

- Zolpidem (Ambien). According to https://medlineplus.gov/druginfo/meds/a693025.html, this medication is used to treat insomnia, class of medications called sedative-hypnotics. There are many reports of  Ambien causing sleep walking or sleep driving. See https://www.huffingtonpost.com/2014/01/15/ambien-side-effect-sleepwalking-sleep-aid_n_4589743.html.

142. Around March 2017, Plaintiff got off the psychotropic medications because of a pregnancy. About six months later, Plaintiff became a normal person. Her head was cleared up. She felt calmer, more focused and peaceful. Her last seizure occurred in March 2017. Plaintiff no longer had any conflict with anyone and there was no encounter with the police. She has found herself again. She does not feel impulsive. She was able to focus and complete tasks efficiently.

143. On and about February 2018, a pharmacist and a pharmacologist looked at her prescription history and the mystery was solved. All of the symptoms attributed to personality disorders were caused by the psychotropic overmedication by her psychiatrist.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

# CAUSES OF ACTION

FIRST CAUSE OF ACTION (42 U.S.C §1983, 42 U.S.C §1985) AGAINST CCC DEFENDANTS

1.      FOR VIOLATION OF PLAINTIFF'S RIGHTS TO PRESUMPTION OF INNOCENCE UNDER THE DUE PROCESS CLAUSE OF THE 5-TH AMENDMENT AS INCORPORATED UNDER THE 14-TH AMENDMENT BY THE USE OF PREVIOUS UNFOUNDED CPS INTERACTIONS IN 2010, CPS INTERACTION CUT SHORT BY A SWITCH OF CUSTODY, POLICE INTERACTIONS RESULTING IN NO CHARGES, POLICE INTERACTION WITH THE NANNY RESULTING NO CHARGES, FAKED RESTRAINING ORDER BY THE CHILD FATHER, AND PENDING CHARGES WHICH WERE EVENTUALLY DISMISSED

2.       FOR VIOLATION OF PLAINTIFF'S RIGHTS TO DUE PROCESS BY FABRICATION OF EVIDENCE AND PERJURY IN STATUS REPORT AND TESTIMONY AT TRIAL

3.      FOR VIOLATION OF PLAINTIFF'S 6-TH AMENDMENT RIGHT TO COUNSEL BY INTERACTING WITH PARENTS WITHOUT MIRANDA-LIKE WARNING AND WITHOUT THE PRESENCE OF THEIR ATTORNEYS.


144. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.


145. The rights to presumption of innocence is clearly established under the Fifth Amendment and the Fourteenth Amendment is "clearly established" such that any of the CCC Defendants and the DOES Defendants would know that it is a violation of Plaintiff's civil rights to submit to the

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

dependency court unfounded allegations and charges still pending trial as proof of Plaintiff's

unfitness as parent to terminate her parental rights.

146. The CCC Defendants were acting under color of state law when they acted, agreed and

conspired to maliciously violate plaintiff's constitutional right to the presumption of innocence

until found guilty by a court of law.

147. In many case status reports and briefs submitted to the state trial and appellate courts, the

County cited unfounded previous CPS interactions with Plaintiff causing undue prejudice to

Plaintiff.

148. The County falsely accused Plaintiff of leaving her child with an appropriate caregiver after

the caregiver was falsely arrested in an incident where she was not with the child.

The County alleged to the courts that plaintiff committed assault with weapons (when

subsequently the accuser retracted his false allegation), that Plaintiff was injured in a domestic

violence incidence by her partner (when in fact she got cut by glass when trying to open a stuck

glass bathroom window while her partner was in the living room), that Plaintiff was under the

influence of drug when in fact she was a victim of someone slipping a drug in her drink, etc.

149. The county reported to the dependency courts that the father of the child Ralph Granich had

obtained a restraining order against Plaintiff that she violated the restraining order.

It is a common knowledge that when restraining orders are often used as a tactic for custody and

litigation advantage.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

150. In the dependency case, social worker Porter reported that Granich went looking for Plaintiff so a reasonable person would not believe that there was no good reason for him to ask the court for an order keeping Plaintiff away from him.

151. Porter knew that Plaintiff was away. Upon information and belief, Plaintiff believes that social worker Porter had contacted with Granich and advised him to get a restraining order against Plaintiff while she was out of state and did not know about the court proceeding for the restraining order.

152. Upon information and belief, because of Porter's history of setting people up, Plaintiff alleges that Porter wanted Granich to obtain a restraining order to strengthen the County's dependency case against Plaintiff.

153. Upon information and belief, Plaintiff alleges that Porter advised Granich to trick Plaintiff to go to his mother's house (where he lived) to get the promised rent deposit so he could call the police to report a violation of the restraining order.
While the charge for violating the court order was still pending, the County went ahead to report the restraining order and the violation of the restraining order without any qualification to the dependency court and in a response brief to the state appellate court.

154. The status reports were submitted to the court by the social worker, the social worker's supervisor and the county directors without verification so that they could lie and commit perjury to contaminate the case with mountains of lies and misrepresentations.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

155. The County counsels then could use, without fact checking, falsehoods their arguments to the dependency court and the appellate court to deprive Plaintiff of her child and to terminate her parental rights.

156. As a result of the CCC Defendants' actions, Plaintiff was denied familial relationship with her toddler son since 2016 and her parental rights terminated by the dependency court.

157. These actions, and/or inactions, of COUNTY and SOCIAL SERVICES DEFENDANTS are the moving force behind, and direct and proximate cause of SALAH's injuries, as alleged herein; and as a result, SALAH has sustained general and specific damages to an extent and in an amount to be proven at trial. SALAH has incurred, and will continue to incur, attorney fees, costs and expenses, including those authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

SECOND CAUSE OF ACTION - MONELL RELATED CLAIMS

AGAINST CONTRA COSTA COUNTY, TWA; AND DOES 1 TO 100.

158. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

159. Upon information and belief, Plaintiff alleges this is a custom and practice that was officially adopted by CCC DCFS as a policy or a custom or practice by CCC DCFS that is not written or formally adopted, but that is a pervasive and long standing practice or alternatively that there is a failure by CCC DCFS the County Legal Department to train, to supervise, to

discipline the County DCFS employees against violations of civil rights of parents in dependency proceedings by these and other practices:

a)  The policy and practice of petitioning for dependency of children without sufficient notice using surprises and ambushes to prevent parents and their attorneys from being prepared to counter false evidence and allegations.

b)  The policy and practice of petition the dependency court without any past, present or risk of future danger, neglect or abuse.

c)  The policy and practice of not offering services to avoid removing children from their familiar environment and parental care. In this case, the county did not offer any help with housing and did not petition the court for an order keeping the supposedly dangerous nanny away from the child.

d)  The policy and practice of using false evidence, distorted facts and concealment of exculpatory evidence in dependency proceedings.

e)  The policy and practice of using previous CPS cases to issue threat bypass, unwarranted by state law, to coerce pleas of no-contest so the County can avoid its burden of proof with clear and convincing evidence of neglect, abuse or danger to the child.

f)  The policy and practice of using past CPS case to start a new dependency case against siblings without proof of danger, neglect or abuse and without any consideration for change of circumstances where past issues have been remedied.

g)  The policy and practice of obstruction of placement of the dependent children with family or relatives to traumatize parents putting them in fragile mental states not conducive to succeed in the reunification services.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

h)  The policy and practice of obstruction and delay services to address issues resulting in the dependency proceeding. For example, if competent mental and medical help had been provided, the root cause of Plaintiff's mental health would have been discovered.

i)  The policy and practice of treating any mental health issues as per-se parental unfitness requiring the termination of parental rights.

j)  The policy and practice of colluding with appointed counsels to circumvent production of status report in statutory required time before the hearing so the parents could prepare for the hearing and object to false allegations in the report.

k)  The policy of colluding with appointed counsels and judges of the dependency court to threaten parents with the appointment of a GAL if they objected to ineffective assistance of counsels.

l)  The policy and practice of retaliating against the parents for bring up concerns that the child was abused or neglected while under foster care.

m)  The policy and practice of not provide sufficient funding and staffing of DCFS so that the social workers have a reasonable caseloads so they do not resort to shortcuts, making up evidence and false allegations to get rid of cases.

n)  The policy and practice of not presenting exculpatory evidence. For example, CCC DCFS social workers and counsels, the psychology intern Cotas and Cloutier knew about the effects of psychotropic medications but they kept quiet so they can characterized Plaintiff as out of control crazy with incurable personality disorders unfit to be a parent.

o)  The policy of using personality as a criterion for parental fitness.

p)  The policy of using vague criteria such as "respectful to others" that have nothing to do with danger, neglect or abuse as criteria to terminate parental rights. Under policy Plaintiff is pretty sure that CCC DCFS could justify taking Baron Trump for adoption.

q)  The policy and practice of presumption of guilt before proven.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

r) The policy and practice of hiring without background checking (e.g. LiveScan) of criminals and sociopaths and promoting them within CCC DCF because these people have no moral and ethics against taking children for Title IV-E to profit the County.

s) The policy and practice of sweeping civil rights violations and wrongdoings under the rug and refusing to remedy past mistakes and misconducts (e.g. by Suzanne Porter).

t) The policy and practice of allowing CCC counsels to use false allegations and perjury by the social workers at trial and briefs submitted to the state courts.

u) The policy and practice of targeting minorities, single women with low incomes, victims of domestic violence.

etc.

160. This list is not exhaustive due to number of violations by CCC DCFS and the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. SALAH reserves her right to amend this pleading as more information becomes available.

161. Defendants knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that they would, and did, cause SALAH to be injured and damaged by COUNTY's wrongful policies, or deliberate lack thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in the contravention of public policy and their legal duties and obligations to SALAH; and that such policies subject them to injunctive relief which SALAH asserts herein.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

162. These actions, and/or inactions, of COUNTY and SOCIAL SERVICES DEFENDANTS are the moving force behind, and direct and proximate cause of SALAH's injuries, as alleged herein; and as a result, SALAH has sustained general and specific damages to an extent and in an amount to be proven at trial. SALAH has incurred, and will continue to incur, attorney fees, costs and expenses, including those authorized by 42 U.S.C. §1988, to an extent and in an amount subject to proof at trial.

THIRD CAUSE OF ACTION

INJUNCTION AGAINST FURTHER CIVIL RIGHTS VIOLATIONS AND ACTS IN FURTHERANCE OF PAST CIVIL RIGHT VIOLATIONS AND ORDER TO REMEDY PAST WRONGS

163. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

164. Plaintiff respectfully requests that the court issues an injunction against the CCC Defendants from taking further any actions to deprive plaintiff of her son including any action to adopt her son.

165. Plaintiff respectfully requests further that the court issues an order for the CCC Defendants to conduct an investigation to product a list of possible parent and children victims (in particular, those by Suzanne Porter), to provide remedies and financial compensations to their losses and sufferings.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

FOURTH CAUSE OF ACTION AGAINT PLAINTIFF GAGLIANI

FOR LEGAL MALPRACTICE

166. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

167. Gagliani was appointed by the court to represent plaintiff as a parent in the dependency action but she failed to act competently and zealously to protect plaintiff's legal interests.

168. Gagliani failed to investigate the facts of the 2010 CPS case and failed to research into the relevant and applicable law on bypass of services.

169. Her sole focus at the beginning was to minimize the amount of work through fraud, coercion of Plaintiff into making a no contest plea. Afterwards, Gagliani failed to communicate with Plaintiff and failed to defend Plaintiff against further lies and obstructions of service by CCC DCFS.

170. Gagliani breached in her duty of loyalty to Plaintiff when she conspired with the County to shorten notice and delivery of the jurisdiction and disposition reports to facilitate her scheme of deceiving Plaintiff into believing that there was a danger of bypassing of service when there was none warranted by law. As a result Plaintiff had no choice by to plead no contest giving the CCC DCFS a free pass to avoid having their false allegations disproved at a contested hearing.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

171. Gagliani's breach is the actual and proximate causes of Plaintiff not being able to reunite with her son and having her parental rights terminated.

172. Plaintiff requests the court award to her general and specific damages to be proven at trial.

FIFTH CAUSE OF ACTION AGAINT PLAINTIFF GAGLIANI FRAUD, CONCEALMENT, MISREPRESENTATION AND COERCION

173. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

174. Alternatively, Gagliani knew about the facts of the 2010 CPS case and that under the applicable law the County must offer services.

175. However Gagliani wanted to save herself work so she concealed this fact from Plaintiff.

176. Plaintiff Gagliani took advantage of Plaintiff's lack of legal knowledge to deceive and coerced into giving up her rights to contest the false allegations against her.

177. As a result she found herself trapped into a system designed not to help but to punish parents and to take away children for profits.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

SIXTH CAUSE OF ACTION

INFLICTION OF EMOTIONAL DISTRESS AGAINST CCC DEFENDANT AND GAGLIANI AND DOES 1 TO 100

178. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

179. CCC Defendants and Gagliani engaged in the above-mentioned extreme, outrageous, unlawful and unprivileged conduct including but not limited to using and abusing legal process to take Y.G. from the love and care of Plaintiff. CCC Defendants acted in concert to obstruct, delay reunification services and placement with maternal family and relative. Upon information and belief, CCC Defendants conspired and help Granich with the temporary restraining order and tricking Plaintiff to violate the restraining order, resulting in an arrest.

180. CCC Defendants failed to prevent or encouraged the foster parents to brainwash Y.G. into thinking that they were his parents even though the dependency process had not been finalized.

181. These defendants acted intentionally and/or reckless causing Plaintiff to suffer severe emotional distress. She became more and more agitated. As a result, her psychiatrist increased the dosage as well as the number of psychotropic medication resulting one episode of suicidal ideation and other episodes of confusion, amnesia, further agitation, etc.

182. Defendants know or should have known that their egregious conducts cause severe emotional distress. Indeed defendants' action caused plaintiff to be hospitalized once for mental distress.

183. Plaintiff requests the court award to her general and specific damages to be proven at trial as well as punitive damages.

SEVENTH CAUSE OF ACTION

FRAUD AND MISREPRESENTATION AGAINST CCC DCFS

184. Plaintiff Salah realleges and incorporates herein as if set forth in full, all paragraphs in this complaint.

185. By telling Plaintiff that she had no right to ask for placement with relatives and by telling a relative that her volunteering to adopt would be consider but no action was taken, defendants committed fraud and misrepresentation.

186. As a result Plaintiff child was placed with relatives of the father. They conspired to provoke and traumatized plaintiff by abusing and neglect the child. At a supervised visitation, Plaintiff found her child bruised, bite marks, long nails, uncut hair, wearing the same clothes for weeks and suffering from an ear infection and covering with foot and mouth sores.

187. CCC Defendants knew about the effects of the psychotropic medications but through the service agreement they forced Plaintiff to stay on the medication so Plaintiff continued to suffer the effects. CCC Defendant want to interpret the side effects to prove that Plaintiff has incurable personality disorder so they could make a case for terminating her parental rights.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

188. Defendant Thysell deliberately delayed services Plaintiff had to complete. She wanted to send Plaintiff to a parenting class held at night in a dangerous neighborhood where there was no public transportation. Then she tormented Plaintiff by saying that "the clock is ticking."

189. CCC Defendants forbade Plaintiff to talk to her son Y.G. in Arabic. At his birthday, Plaintiff brought Y.G. some traditional clothes and the visitation supervisors laughed at him. Plaintiff believed that she and her son were discriminated against on the basis of their ethnic origin.

190. Plaintiff requests the court award to her general and specific damages to be proven at trial.

EIGHT CAUSE OF ACTION AGAINST CCC DEFENDANTS FOR VIOLATION OF THE ADA
To be amended.

NINTH CAUSE OF ACTION AGAINST GRANICH FOR ABUSE OF PROCESS
To be amended.

TENTH CAUSE OF ACTION AGAINST GRANICH FOR MALICIOUS PROSECUTION
To be amended.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

## PRAYER

WHEREFORE, SALAH prays for judgment against Defendants, and each of them, as to all causes of action as follows:

1. Plaintiff demands a jury trial on all issues except for those for injunctive or declarative reliefs.

2. Plaintiff requests that the court grants her all the reliefs and compensations for damages to be requested and proven and other reliefs the court deems proper in the interest of justice.

3. Punitive damages against the individual defendants as allowed by law.

4. Declarative and injunctive relief to be based on a separated application.

5. For attorneys fees and costs as authorized by law.

6. Such further relief as the Court deems just and proper.

Respectfully Submitted,

Date: May 4, 2018

_____

Quoc T Pham, Esq.,

Attorney for Plaintiff

49

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

months. (See W & I Code section 361.5(a)(2) for exceptions). When calculating the 6-month period, the 60 day period in which the child was placed in out of home custody or 60 days of the jurisdiction hearing, whichever is earlier.

2. If a child is three years of age or older at the time of removal, court ordered services shall not exceed 12 months. (See W & I Code section 361.5(a)(2) for exceptions). The twelve-month time period is calculated the same as in footnote #1.

3. Judicial Days/Hours

4. When a minor is a dependent child of the court and remains in the home and there is a reasonable cause to believe that the minor is a person described in subdivision (a), (d) or (e) of section 300 of the Welfare and Institutions Code, court proceedings shall commence and the minor shall be committed to the care, custody and control of the probation officer.

Salah v. Contra Costa County et al.

FIRST AMENDED COMPLAINT

## Juvenile Dependency Proceedings
### (Welfare & Institutions Code Section 300 et seq.)



1. If a child is under the age of three at the time of removal, court ordered services shall not exceed six months. (See W & I Code section 361.5(a)(2) for exceptions). When calculating the 6-month period, the time shall begin either 60 days after the child was placed in protective custody or from the date of the jurisdiction hearing, whichever is earlier.
2. If a child is three years of age or older at the time of removal, court ordered services shall not exceed 12 months. (See W & I Code section 361.5(a)(2) for exceptions). The twelve-month time period is calculated the same as in footnote #1.
3. Judicial Days/Hours
4. When a minor is a dependent child of the court and remains in the home and there is a reasonable cause to believe that the minor is a person described in subdivision (a), (d) or (e) of section 300 of the Welfare and Institutions Code, court proceedings shall commence and the minor shall be committed to the care, custody and control of the probation officer.